**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JAMES R. ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 17-181-MPT |
| | ) |
| THE HON. JOHN CARNEY, | ) |
| Governor of the State of Delaware, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MOTION TO STAY
COURT'S JUDGMENT ORDER (D.I. 39, 62) PENDING APPEAL**

On April 10, 2017, Plaintiff filed his Amended Complaint, claiming that "the provision of Article IV, Section 3 of the Constitution of the State of Delaware mandating political balance on the courts is unconstitutional as it violates the freedom of association guaranteed by the First Amendment to the Constitution of the United States." D.I. 10 at 11. As this Court recognized, those constitutional provisions involved two operative terms: a "major political party" provision requiring some members of the Delaware Courts to be members of one of the two major political parties in Delaware, and the "bare majority provision" prohibiting any party from having more than a one-judge "majority" on the Courts. D.I. 61 at 8-9 and n. 45. On December 6, 2017, this Court granted Plaintiff's motion for summary judgment, holding that: (1) Plaintiff lacked Article III standing to challenge provisions four and five of Article IV, Section 3 (as to the Family Courts and the Courts of Common Pleas) because, among other things, those provisions involved only the "bare majority provision" that did not preclude Plaintiff, as an independent, from applying for a judicial position; (2) that Article IV, Section 3 violated the First Amendment by restricting government employment based on political affiliation; and (3) that the "policymaker

1

exception" to this general rule does not apply. D.I. 40 at 7, 13. This Court entered Judgment the same day. D.I. 39.

Defendant filed a notice of appeal and timely filed a Motion for Reconsideration/Clarification requesting clarification on three issues: (1) whether the Court intended to adjudicate the constitutionality of the "bare majority provisions" applicable to the Court of Common Pleas and the Family Court in light of the Court's determination that Plaintiff lacked Article III standing to challenge those provisions; (2) whether the Court's determination that Plaintiff lacks Article III standing to challenge the 'bare majority" provisions applicable to the Court of Common Pleas and the Family Court also applied to Plaintiff's Article III standing to challenge the "bare majority provisions" applicable to the Supreme Court, Court of Chancery and Superior Court; and (3) whether the Court intended to hold that the "bare majority provisions" applicable to the Supreme Court, Court of Chancery and Superior Court were unconstitutional, in light of the fact that those provisions do not preclude persons who are not members of a major party from applying. D.I. 42, 49.

On May 23, 2018, the Court denied reconsideration, but granted clarification, and issued its Memorandum Opinion Clarifying the Court's December 6, 2017 Opinion. The Court's clarified Opinion largely reiterated the December 6 Opinion (D.I. 61 at 1-6, 12-18), but added more detail regarding the Court's findings on standing (D.I. 61 at 7-12). The Court's Opinion did not address the first question on which the Governor sought clarification: whether the Court had adjudicated the constitutionality of the provisions applicable to the Court of Common Pleas or the Family Court in any respect. The Court's clarifying opinion did further address the standing issue. The Court held that "Plaintiff has demonstrated constitutional standing as to the *"major political party" provisions of Article IV, § 3* of the Constitution of the State of

Delaware." D.I. 61 at 10 (emphasis added). The Court did not, however, hold that Plaintiff had Article III standing to challenge the "bare majority provisions," which is unsurprising considering the Court's holding that Plaintiff did not have Article III standing as to the provisions applicable to the Court of Common Pleas and Family Court because those provisions did not require that an applicant be a member of a major political party. (D.I. 61 at 8-9 & n. 45). Finally, despite Plaintiff's lack of Article III standing to challenge the "bare majority provisions," the Court nonetheless held those provisions unconstitutional, finding that Plaintiff had prudential standing to challenge those provisions. D.I. 61 at 11-12, 17.

In this Motion, Defendant requests that the Court stay its Judgment Order on summary judgment pending Defendant's appeal and in support states as follows:

1. To obtain a stay pending appeal, Defendant must ordinarily show: (i) a strong likelihood of success on the merits; (ii) irreparable harm absent a stay; (iii) that issuance of the stay will not substantially injure Plaintiff; and (iv) that the public interest supports a stay. *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

2. The likelihood of success on the merits factor, however, is often relaxed in cases that raise on appeal "substantial difficult or novel legal issues" or when there is the risk of "potential irreparable harm to the party seeking the stay[.]" 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2904 (3d ed.) (citing cases). For example, in *Corpus Christi Indep. School Dist. v. Cisneros*, 404 U.S. 1211 (1971), the Supreme Court stayed a case pending appeal in light of the difficult issues of first impression presented. Similarly, in *AARP v. Equal Emp't Opportunity Comm'n*, 390 F. Supp. 2d 437, 462-63 (E. D. Pa. 2005), the court stayed its decision pending appeal in light of the fact that "where 'the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause

relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay.'" (quoting *Providence Journal Co. v. FBI*, 595 F.2d 889, 889 (1st Cir.1979)).

3. Considering the foregoing standards, a stay is warranted in this case. Defendant's appeal presents substantial legal questions—in fact, issues of first impression. Moreover, as set out below, absent a stay there is substantial risk of irreparable harm not only to Defendant, but to the Delaware General Assembly, the public, and governmental institutions nationwide (including our federal government) that appoint judicial officers. By comparison, a stay does not prejudice Plaintiff in any manner.

4. ***Potential significant irreparable harm and the public interest support a stay.*** This appeal involves, among other things, an unprecedented issue of constitutional law regarding whether the "policymaker" exception to the prohibition of considering political affiliation for government employment applies to a constitutional mandate for political balance on state courts. This Court's decision holding that judges are not "policymakers" for whom political affiliation is an appropriate requirement in appointment,[1] and the outcome of any appeal, has broad implications not just for Delaware, but for numerous other states, and even the President of the United States and United States Senate, who nominate and consent to appointment of judges. The potential ramifications of this Court's decision could be widespread, creating a cloud of uncertainty over the judicial nomination process nationwide. And the Court's determination that the "bare majority" provision is unconstitutional raises issues with respect to political balance

---

[1] Defendant is well aware of the full contours of this doctrine, as interpreted by the Third Circuit and other courts. *See* D.I. 29 at 18-20. The term "policymaker exception," as used herein, is simply shorthand.

4

requirements contained in federal statutes. *See, e.g.*, 15 U.S.C. § 78d(a) (establishing political balance requirements for the SEC, based on party affiliation).

5. Regarding the harm to the Defendant in particular, during the pendency of this appeal Defendant is obligated to fill numerous judicial vacancies in compliance with the Court's ruling and with the remaining provisions of Article IV, Section 3 of the Delaware State Constitution. In fact, two vacancies currently exist which the Governor has re-opened, potentially jeopardizing compliance with Article IV, Section 3's requirement that the Governor submit an appointee within 90 days of the vacancy. Further, we expect that the General Assembly will approve two new Chancery positions by the end of June, creating two additional vacancies on Delaware state courts as early as July 1.[2] *See generally* Ex. A (Matt Chiappardi, *Del. Gov. Backs Strine's Proposal to Expand Chancery Bench*, Law360 (Jan. 25, 2018, 8:19 PM EST), https://www.law360.com/articles/1005610/del-gov-backs-strine-s-proposal-to-expand-chancery-bench).

6. However, as a result of the Court's declaring the "bare majority" provision unconstitutional, in undertaking these obligations, the Governor may be precluded from preserving the "nonpartisan" nature of the Delaware courts. This balance is a critical component of the Delaware judiciary, particularly the Court of Chancery, which is viewed as a nonpartisan forum for the resolution of the nation's most significant corporate disputes. The judicial appointments made during the pendency of the appeal will be for twelve-year terms, thus creating the prospect that the present balance on the Court of Chancery could be lost for years. Theoretically, the Governor could delay appointments—contrary to the 90-day requirement in the Delaware Constitution—but such a delay, even if possible, would deprive the Delaware

---

[2] The Governor expects a bill to be introduced when the General Assembly reconvenes.

courts of critically needed resources. The Governor (and General Assembly) should not be forced to delay making critical judicial appointments when there is an alternative—maintaining the status quo by staying the Judgment Order pending appeal.

7. Another irreparable injury involves the potential for judicial interference with the process of appointing judges in Delaware. The Plaintiff in this case already has made clear his intention to seek contempt hearings if he believes the Governor (or, presumably, the Delaware General Assembly) takes political affiliation into consideration when filling vacancies. D.I. 57, 59. Plaintiff has asked this Court to hold the Governor in contempt and has argued that the Governor would be in contempt if the Governor were to exercise even his *discretion*, beyond any constitutional mandate, to maintain political balance and representation on the Delaware judiciary. While the Governor disagrees with Plaintiff's assertion that such an exercise of discretion would be in contempt of this Court's ruling, the issue has not been expressly addressed by this Court. The specter of judicial involvement in the process of appointing judges in Delaware is compounded by Plaintiff's failure to seek an injunction that specifies the conduct permitted and prohibited while, nonetheless, seeking to hold the Governor in contempt if the Governor disagrees with the Plaintiff's interpretation of this Court's ruling. Rather than permitting this proceeding and an entire state's process of making judicial appointments to proceed under the cloud of potentially serial motions for contempt, based on the whims of a single individual who plainly disagrees with the scope of the Court's rulings, the better course is to stay the effect of the decision until these unprecedented issues can be resolved on appeal.

8. In light of this potential for irreparable harm and the public interest a stay, maintaining the status quo pending resolution of these issues by the Third Circuit, is warranted.

9. *A stay will not injure Plaintiff*. This factor does not support denial of a stay, particularly when weighed against the significant issues of first impression and the potential harm to Defendant, Delaware's state judiciary, and the public. Plaintiff obtained the relief he sought on the merits. In fact, despite Defendant's questions regarding the ambiguities of the Court's decision, Defendant gave Plaintiff the benefit of his own interpretation of the Court's ruling, and will continue to do so for any application Plaintiff submits in response to a notice of judicial vacancy. Plaintiff's recent application for a Superior Court vacancy was considered solely on the merits of his candidacy, and without regard to political party. *See* D.I. 58 at Ex. A. Moreover, as Defendant detailed in his briefing on summary judgment (*see, e.g.*, D.I. 29 at 7-8, 13-14, 17-18; D.I. 37 at 3-4), Plaintiff has largely failed to show legitimate interest in actually obtaining a judgeship rather than merely litigating an academic interest. Such a conclusion is supported by the fact that Plaintiff never moved for an injunction.

10. ***Defendant is likely to succeed on the merits***. Finally, although this factor is not determinative in this case, Defendant respectfully submits that the success on the merits factor weighs in favor of a stay, given several plain errors of law in the Court's ruling.

11. First, the Court determined that the "policymaker" exception to the prohibition of consideration of political affiliation for government employment did not apply. *See* D.I. 61 at 14-18. This holding is unprecedented. As Defendant articulated in opposition to Plaintiff's summary judgment motion, persuasive precedent has held or found that judges are policymakers. *See* D.I. 34 at 6-7. Neither this Court nor Plaintiff has cited any decision holding that judges are not policymakers. Yet, this Court rejected the decisions cited by Defendant because they "addressed situations [in] which political affiliation could be considered, but was not constitutionally mandated"—*i.e.*, situations involving "discretion." D.I. 61 at 15-16. In other

7

words, the Court's distinction implies that the Governor could still make judicial appointments based on political affiliation in his own discretion. However, Plaintiff advocates that the Governor has no such discretion and has sought contempt hearings on that basis. Plaintiff's position and the distinction relied upon by this Court cannot be reconciled.

12. Moreover, the position of a judge is a policymaking position, satisfying the "policymaker" exception, particularly in Delaware where key corporate laws are entirely judge-made common law. Plaintiff's only support for his contrary position were cases focusing solely on one aspect of a judge's responsibility: interpreting statutes, which the Governor agrees requires judges to interpret statutes and not make law. *See, e.g.*, D.I. 35 at 12 (citing *Washington v. Trump*, 2017 WL 462040 at *3 (W.D. Wash. Feb. 3, 2017) ("The work of the court is not to create policy or judge the wisdom of any particular policy promoted by the other two branches[.]"). However, this truncated vision of a judge wholly ignores the role of a judge in expressly making common law. In Delaware, this common law involves the definition and application of fiduciary duties applicable to officers, directors and managers of Delaware corporations and legal entities. These fiduciary duties are not defined by statute in Delaware. These duties are defined by the Delaware Supreme Court and Court of Chancery. And this judge-made law is a critical area of law for the State of Delaware, corporations, directors, and stockholders; and is debated endlessly on policy grounds by academics, lawyers, judges and business persons. *See, e.g.*, *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015) (determining whether and when stockholder approval of a corporate transaction eliminates claims for breach of duties against fiduciaries); *In Re MFW Shareholders Litig.*, 67 A.3d 496 (Del. Ch. 2013) (determining what forms of corporate process will alter the standard of judicial review). Under a common law system, judges <u>are</u> making policy, albeit case by case.

13. Further, political affiliations consciously and unconsciously affect judicial attitudes or philosophy.[3] While the Court relied on the Delaware Judges' Code of Judicial Conduct in determining that political affiliation is not an appropriate requirement for judicial appointments, *see* D.I. 61 at 16-17, such ethical prohibitions against outside influence and political activity have no bearing on the *ex ante* political considerations that appointing bodies inevitably take into account when seating judges, nor do they address the actual question of whether political affiliation is an appropriate requirement for a judge. The "bare majority" provisions of Article IV, Section 3 seek to curtail the impact of any dominant attitude or philosophy by preventing any political party—and any judicial philosophies evidenced by party affiliation—from dominating or attempting to dominate the judicial system and decision-making.

14. Further, regarding standing, the Court determined that Plaintiff only had Article III standing to challenge the "major party provisions" of Article IV, Section 3 of the Delaware Constitution, correctly recognizing that the "bare majority provision" would never affect an unaffiliated candidate because that provision only applies to a party that already has a majority of seats. D.I. 61 at 8-9. Despite that, the Court found that Plaintiff could challenge those remaining sections for which he lacked "constitutional" standing because he had "prudential" standing. *Id.* at 12. However, such a holding, raised *sua sponte*,[4] is contrary to the law.[5] Accordingly, the

---

[3] *See, e.g.*, *Newman v. Voinovich*, 986 F.2d 159, 165 (6th Cir. 1993) ("[I]t would ignore reality to suggest that a judge is not influenced by an infinite number of factors . . . . Moreover, as a direct result of those factors, a judge does create a particular brand of governmental policy."); Hon. Theodore A. McKee, *Judges As Umpires*, 35 HOFSTRA L. REV. 1709, 1724 (2007) ("I am troubled by the fact that our jurisprudence is shaped by personal beliefs, but I am more troubled by pretending that judges can somehow become perfect objective adjudicators at the flip of a switch, or the wearing of a robe.").

[4] Defendant's briefing on summary judgment made clear that both "constitutional" and "prudential" standing was required, and Plaintiff's briefing did not indicate otherwise. D.I. 29 at 11 ("Standing has constitutional and prudential components, both of which must be established before a plaintiff can seek redress in federal court.") (citing *UPS Worldwide Forwarding, Inc. v.*

Court's holding that Plaintiff lacked Article III standing to challenge provisions four and five necessarily means that the Court was not presented with a constitutionally required "case or controversy" as to those provisions, and therefore lacked subject matter jurisdiction to strike down Article IV, Section 3 in its entirety. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 192 n.31 (3d Cir. 2016) ("Our conclusion that the named plaintiffs lack Article III standing means that we do not have subject matter jurisdiction to reach the merits of plaintiffs' claims.").

WHEREFORE, for the foregoing reasons, Defendant respectfully requests the Court stay the Judgment Order entered on December 6, 2017, and as revised on May 23, 2018, pending appeal.

---

*U.S. Postal Serv.*, 66 F.3d 621, 625 (3d. Cir. 1995)). The Court faults Defendant, however, for failing to rebut "plaintiff's argument, that the Supreme Court has recognized that Article III standing is not a requirement for prudential standing in First Amendment cases[.]" D.I. 61 at 11-12 (citing D.I. 35 at 10). Defendant is not aware of Plaintiff raising such an argument.

[5] "[N]either the counsels of prudence nor the policies implicit in the 'case or controversy' requirement should be mistaken for the rigorous Art. III requirements themselves. Satisfaction of the former cannot substitute for a demonstration of 'distinct and palpable injury . . . that is likely to be redressed if the requested relief is granted.'" *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979)) (internal quotation marks omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an *essential and unchanging* part of the case-or-controversy requirement of Article III.") (emphasis added); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) ("To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact . . . .").

Dated: June 1, 2018

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ Pilar G. Kraman
David C. McBride (No. 408)
Martin S. Lessner (No. 3109)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
dmcbride@ycst.com
mlessner@ycst.com
pkraman@ycst.com

*Attorneys for Defendant*

11

## **CERTIFICATE OF SERVICE**

I, Pilar G. Kraman, hereby certify that on June 1, 2018, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>David L. Finger, Esquire
>Finger & Slannina, LLC
>One Commerce Center
>1201 N. Orange St., 7th Floor
>Wilmington, DE  19801
>*dfinger@delawgroup.com*
>
>*Attorneys for Plaintiff*

I further certify that on June 1, 2018**,** I caused the foregoing document to be served via electronic mail upon the above-listed counsel.

| | |
|---|---|
| Dated:   June 1, 2018 | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| | |
| | */s/  Pilar G. Kraman*  |
| | David C. McBride (No. 408) |
| | Martin S. Lessner (No. 3109) |
| | Pilar G. Kraman (No. 5199) |
| | Rodney Square |
| | 1000 N. King Street |
| | Wilmington, Delaware 19801 |
| | *dmcbride@ycst.com* |
| | *mlessner@ycst.com* |
| | *pkraman@ycst.com* |
| | |
| | *Attorneys for Defendant,* |
| | *The Hon. John Carney* |